UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KELLY ELIZABETH FOX,

       Plaintiff,

-against-

NORTHWELL HEALTH INC., THOMAS GUY,
Individually, STEPHANIE RUSSO, Individually,
and JUDE KOTSOVOLOS, Individually,

       Defendants.
------------------------------------------------------------x

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, Kelly Elizabeth Fox, (hereinafter "Plaintiff") by her attorneys, SLATER SLATER SCHULMAN LLP, hereby submits this Complaint and complains of the Defendants, upon information and belief, as follows:

**NATURE OF THE CASE**

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII") and the New York State Human Rights Law, New York State Executive Law § 296, et seq. ("NYSHRL"). Plaintiff seeks damages to redress the injuries she suffered because of being exposed to gender/sexual discrimination, hostile work environment based on sex, retaliation, and wrongful termination.

**JURISDICTION AND VENUE**

2. Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

1

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state laws pursuant to 28 U.S.C. §1367.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the actions or omissions giving rise to the claims for relief, occurred within the Eastern District of New York.

## PROCEDURAL PREREQUISITES

5. On or around June 3, 2020, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") against Defendant employer as set forth herein.

6. On or about November 3, 2021, the NYSDHR mailed an Order of Dismissal to Plaintiff.

7. On or about May 19, 2022, the EEOC mailed a Right to Sue Letter to Plaintiff.

8. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

## PARTIES

9. Kelly Elizabeth Fox ("Plaintiff") is an individual female who resides in Suffolk County, New York.

10. At all times relevant, Plaintiff was an employee of Defendant Northwell Health, Inc. (Hereinafter "Northwell," "Hospital," "Defendant," and "Defendants").

11. At all times relevant herein, Plaintiff was an employee of Defendant Hospital as defined under the aforementioned statutes.

12. At all times herein relevant, Defendant Northwell was and is a domestic entity duly organized and existing under and by virtue of the laws of the State of New York.

13. At all times relevant, Defendant Northwell was Plaintiff's "employer" for purposes of the aforementioned statutes.

14. Defendant Thomas Guy (Hereinafter "Defendant" and "Defendants") is an individual male.

15. Upon information and belief, Defendant Guy was Defendant Northwell's employee during all relevant time periods.

16. Defendant Stephanie Russo (Hereinafter "Defendant" and "Defendants") is an individual female.

17. Defendant Russo was and is a supervisor for Defendant Northwell.

18. Upon information and belief, Defendant Russo had authority regarding Plaintiff's day-to-day work experience and could make decisions regarding the terms and conditions of Plaintiff's employment.

19. Defendant Jude Kotsovolos (Hereinafter "Defendant" and "Defendants") is an individual female.

20. Defendant Kotsovolos was and is a supervisor for Defendant Northwell.

21. Upon information and belief, Defendant Kotsovolos had authority regarding Plaintiff's day-to-day work experience and could make decisions regarding the terms and conditions of Plaintiff's employment.

22. Defendant Northwell is a covered employer within the meaning of Title VII and NYSHRL, and at all relevant times, employed Plaintiff or supervised Plaintiff's employment.

23. Plaintiff is a covered employee within the meaning of the Title VII and the NYSHRL.

## FACTS

24. Plaintiff was hired to work at Peconic Bay Medical Center, which subsequently merged with Defendant Northwell, on or around July 11, 2016.

3

25. Plaintiff was hired as a Certified Surgical Technician ("ST") assigned to the Operating Room ("OR") and worked in the OR during her entire tenure with the hospital.

26. Throughout her employment, she regularly received good performance evaluations and had never previously been the subject of any formal or informal discipline.

27. In or about June 2016, Defendant Stephanie Russo was hired by Peconic Bay Medical Center as part of the Northwell team, in the position of Director of Perioperative Services, with supervision and oversight of the OR staff.

28. In this position, Defendant Russo supervised Plaintiff's employment environment.

29. In or about August 2016, Defendant Russo hired Defendant Guy from Southampton Hospital for the position of ST at Peconic Bay Medical Center in the OR.

30. Upon being hired, Defendant Guy joined the union, began to engage in abusive conduct towards Plaintiff as well as other female nurses and OR staff because of their sex/gender.

31. Defendant Guy regularly stated that he would not take orders from his female supervisors and coworkers.

32. Defendant Guy did not treat any male supervisors or coworkers in the same disrespectful manner.

33. Defendant Guy consistently referred to Plaintiff and other female staff as "**BITCHES**" and "**WHORES**."

34. Plaintiff recognized that Defendant Guy's inappropriate language toward her and other female staff was due to their gender, as Defendant Guy did not refer to male employees as "**BITCHES**" or "**WHORES**."

35. These misogynistic terms were used regularly by Defendant Guy towards Plaintiff and other females in the workplace.

36. Defendant Guy was also physically aggressive towards Plaintiff and other female employees.

37. Defendant Guy was routinely physically aggressive to his female co-workers by way of pushing and shoving female OR nurses and staff.

38. Defendant Guy regularly charged at his female co-workers as if he were going to knock them down.

39. The above inappropriate physical contact was not directed towards his male co-workers.

40. In or about April 2018, Defendant Guy verbally and physically intimidated Plaintiff.

41. Defendant Guy accused Plaintiff of "smirking," and as Plaintiff began to respond, Defendant Guy came within inches of Plaintiff's face and began to scream insults at her.

42. Defendant Guy erupted, shouting that no one liked Plaintiff, and called her "**STUPID BITCH**," "**DUMB**," "**LAZY**," "**FUCKING ASSHOLE**," "**USELESS CUNT**," and "**THE WHINIEST BITCH [HE] EVER MET**."

43. Defendant Guy said that he hoped Plaintiff would report him because "if it were between you or me, [Plaintiff] would be fired."

44. Defendant Guy did not speak to his male co-workers in this way.

45. Immediately after Defendant Guy stormed off, Plaintiff reported the incident to her direct manager, Defendant Kotsovolos.

46. Defendant Kotsovolos responded to Plaintiff by stating, "You have to understand that he is on Prednisone and that's not his usual demeanor."

47. A few days after this incident, Defendant Guy burst angrily into the OR and hit Plaintiff with the door on her left arm and shoulder.

48. Defendant Guy did not apologize to Plaintiff for striking her with the door.

49. Plaintiff made several complaints to Defendant Russo and Defendant Kotsovolos about the sexual discrimination, harassment, and hostile work environment that Defendant Guy created.

50. Defendants Russo and Kotsovolos neither took immediate nor remedial action following Plaintiff's complaints about Defendant Guy's abusive behavior.

51. Plaintiff was not the only female employee that complained about being treated in an abusive manner by Defendant Guy.

52. Several staff members signed sworn affidavits affirming their fear of Defendant Guy, due to his abusive behavior toward them and the women that he worked with.

53. Suzanne Moore ("Moore"), Registered Nurse First Assistant, stated in her affidavit that Defendant Guy behaved in a disrespectful and angry manner to her and other female staff on multiple occasions.

54. Moore complained to Assistant Nurse Manager Jaqueline Kelly ("Kelly") that she did not want to work with Defendant Guy. Kelly brushed off Moore's legitimate concerns and only responded, "Now, now. You have to play nice in the sandbox."

55. Moore stated that in her 44 years in the nursing profession, she had "never been afraid of any colleague or staff member. [Defendant] Guy is the only one who has brought out fear in me."

56. Christina Chenche ("Chenche"), Northwell OR nurse, stated in her affidavit that Defendant Guy was "extremely hostile," singled out female staff, and had outbursts of screaming "using angry and derogatory tones."

57. Sylvester Neville ("Neville"), Northwell ST, recounted several incidents in his affidavit wherein Defendant Guy physically and verbally abused female staff. Each of these incidents were reported to Kelly, Defendant Russo, and/or Defendant Kotsovolos.

58. On September 25, 2018, Defendant Guy physically attacked Mary Williams ("Williams"), a RN at Northwell, causing her pain and fear.

59. In or about October 2018, Human Resources ("HR") launched an investigation following accusations that Defendant Guy physically hit Williams while they were in the OR.

60. HR did not keep the investigation confidential, and the entire OR staff, including Defendant Guy (who was suspended during this time), was aware of who had been interviewed.

61. Upon returning to the facility at the conclusion of his suspension, Defendant Guy attempted to intimidate a coworker into revealing what she had told HR in her interview.

62. Defendant Guy laughed and bragged to coworkers that Defendant Northwell paid him back pay that had accumulated during his suspension because "they couldn't prove anything."

63. Defendant Guy continued to intimidate and harass female coworkers, despite his recent suspension for such behavior.

64. After Williams made several further complaints about Defendant Guy, Defendants finally took some action and disciplined Defendant Guy for "Aggression, Hostility, and Violence in the Workplace" in the late fall of 2018.

65. Defendants "encouraged" Defendant Guy to attend a single "Culture of Care" class in an insufficient effort to make the workplace safe from his "foul language and verbal threats to his co-workers."

66. Following Defendant Guy's return from suspension, Plaintiff's supervisors began to retaliate against her.

67. On or about October 31, 2018, Plaintiff was severely reprimanded by Defendant Kotsovolos and was suspended without pay for the day for using the word "ass."

68. The male staff was not suspended when they used such language.

69. In or about December 2018, Plaintiff met with Melissa Truce ("Truce") from HR to grieve her suspension. Plaintiff had met with Truce previously during the investigation of Defendant Guy.

70. Defendants Russo and Kotsovolos, along with Plaintiff's Union Representative Dominique Roberts ("Roberts"), and Plaintiff's Peconic Union Delegate Ernie (last name unknown) ("Ernie"), were present at the meeting.

71. As Plaintiff began to explain herself, Truce screamed at her and promptly denied her grievance.

72. Plaintiff was later notified by Roberts that Truce had told her while Plaintiff's suspension was supposed to be overturned, she decided not to do so, based upon her dislike of Plaintiff.

73. Defendant Northwell's management began to schedule Plaintiff with unreasonable lunch breaks. Her lunch was regularly scheduled either 30 minutes prior to the end of her shift, or she received no break at all.

74. From in or about March 2019 through September 2019, Plaintiff was the sole ST assigned to the ophthalmology surgery room.

75. Since no other ST's were trained to work in this room, Plaintiff was forced to work from Monday through Wednesday from 7:00 AM to 3:00 PM with no breaks, including to use the bathroom, take lunch, or drink water.

76. In or about May 2019, Plaintiff complained to Defendant Russo and Kelly that she needed to cross-train other ST's to provide support because her schedule was unsustainable.

77. Plaintiff broke down in tears in front of Kelly and Russo, pleading for help, as she was being severely overworked.

78. Plaintiff explained that in addition to feeling burnt out at work, she was under a lot of stress at home as well, as she was taking care of her sick mother-in-law and young son.

79. Plaintiff asked Defendant Russo whether Russo was targeting her and whether she disliked her, based upon Russo's overworking and general treatment of Plaintiff.

80. The unreasonable scheduling did not stop.

81. Defendant Northwell continued to schedule Plaintiff with shifts that either had late breaks or no breaks at all through September 2019.

82. From on or about September 16, 2019, through September 23, 2019, Plaintiff was out of work on approved continuous Family and Medical Leave Act ("FMLA") for emergency surgery for a potential aneurysm.

83. Following her surgery, a retinal specialist diagnosed Plaintiff with nonischemic vein occlusion in her left eye. The retinal specialist told Plaintiff that the stress she was under exacerbated this condition.

84. On or about October 3, 2019, Plaintiff met with Defendant Russo, Defendant Kotsovolos, and Plaintiff's 1199SEIU Union delegate, Dawn Kohler ("Kohler").

85. Defendant Russo accused Plaintiff of taking excessive absences from work and presented a print-out of the dates at issue.

86. Plaintiff responded that several of the absences were covered under her FMLA claim.

87. Defendant Russo then shifted the conversation to complaints she had received about Plaintiff from some of her coworkers.

88. The coworkers that complained were all friends of Defendant Guy, including Kelly and Christina Gregory ("Gregory"), both of whom had previously worked with Defendant Guy at Southampton Hospital.

89. In fact, these coworkers had continually mistreated and alienated Plaintiff following her issuing a complaint against Defendant Guy.

90. As Plaintiff began to plead her case about the unfounded claims against her, Defendant Russo slammed her hands on the desk and said, "If you're just going to deny everything, there isn't anything to talk about. You just don't fit in with the way Northwell does things."

91. On or about October 7, 2019, a follow-up meeting was held with Plaintiff, Defendant Russo, Defendant Kotsovolos, and Kohler.

92. Plaintiff's attendance record was no longer present in her write-up and was not mentioned in the meeting. Defendant Russo solely discussed Plaintiff's behavior, of which new complaints were added.

93. At the conclusion of the meeting, Plaintiff was ultimately terminated.

94. In issuing their decision, Defendant Russo, Defendant Kotsovolos, and HR did not follow Plaintiff's union's progressive disciplinary process.

95. If this process had been followed, Plaintiff's prior suspension would have been overturned, and the current disciplinary matter would not have resulted in Plaintiff's termination.

96. Plaintiff filed a grievance regarding her wrongful termination.

97. On or about October 28, 2019, Plaintiff met with Roberts, two other Union representatives, and Defendant Russo.

98. The Union representatives reviewed the statements made against Plaintiff and each concluded that the statements appeared to be coerced and were submitted in an attempt to target Plaintiff.

99. Upon being questioned by the Union representatives, Defendant Russo acknowledged that while Plaintiff voiced her concerns about being unliked and overworked, she did not offer or provide Plaintiff with assistance.

100. All three Union representatives agreed that since Defendant Northwell did not originally follow the standard progressive disciplinary process, Plaintiff's termination should have been downgraded to a suspension with time served, and she was to be reinstated thereafter to her original position.

101. During the hearing, Plaintiff expressed that Defendants Russo and Kotsovolos were aware that in addition to the stressors she faced at work, Plaintiff was taking care of her sick mother-in-law and young son.

102. Plaintiff explained that she was burning the candle at both ends and had reached out to her supervisors for help. However, neither Defendant Russo nor Defendant Kotsovolos provided Plaintiff with the support that she sought.

103. Plaintiff continued that she seriously considered calling a "Code Lavender," which is described on Defendant Northwell's website as "an interdisciplinary group of professionals who are dedicated to supporting their colleagues during times of crisis, stress, and/or trauma." However, Plaintiff was afraid to reach out for help, as she feared a lack of confidentiality, and had already been mistreated by the superiors that were supposed to provide such support.

104. On or about November 17, 2019, Plaintiff received a letter stating that her termination was being upheld.

105. As a result of Defendants' mistreatment of Plaintiff and the stress she has endured, her physical and mental health has suffered significantly.

106. Plaintiff now suffers from a central retinal vein occlusion in her left eye.

107. Plaintiff was told by the neuro-ocular doctor and retinal specialist that her symptoms were exacerbated by lack of sleep, dehydration, anxiety, and stress.

108. As a result of Defendants' continued harassment, Plaintiff suffered numerous injuries including economic and emotional damages.

109. Due to the harassment by Defendants, Plaintiff suffers from high stress and anxiety.

110. Plaintiff experienced emotional pain, suffering, inconvenience, and other non-pecuniary losses.

111. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants.

112. The above are just some of the examples of unlawful conduct to which Defendants subjected Plaintiff to on an ongoing basis.

113. Defendants intentionally discriminated against Plaintiff based on her gender/sex and because of her lawful complaints of discrimination.

114. Defendants exhibited a pattern and practice of not only discrimination but also retaliation.

**AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION UNDER TITLE VII**
(*Not Against Any Individual Defendant*)

115. Plaintiff repeats and realleges every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

116. Plaintiff was an employee within the meaning of Title VII of the Civil Rights Act, 42. U.S.C. § 2000e(f).

117. At all relevant times, Defendant employed more than fifteen (15) employees and was an employer within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b).

118. Pursuant to Title VII, 42 U.S.C. § 2000e-2(a) it is unlawful for an employer to discharge an employee because of such employee's "sex/gender".

119. Defendant violated Plaintiff's rights under Title VII when Defendant created and maintained a hostile work environment based on sex/gender and a hostile work environment based on her sex, and wrongful termination.

120. Defendant also violated Plaintiff's rights under Title VII because the hostile work environment based on sex/gender led to Plaintiff's wrongful termination.

121. But for Plaintiff's sex, Plaintiff would not have been wrongfully terminated.

122. Defendant's unlawful acts were intentional, willful, malicious, and in reckless disregard of Plaintiff's rights.

123. As a result of Defendant's unlawful acts, Plaintiff suffers and continues to suffer damages, in form including, but not limited to, lost income, bonuses, lost future earnings, and also future pecuniary losses, severe emotional distress, mental anguish, humiliation, loss of enjoyment of life, pain and suffering, and other non-pecuniary losses.

**AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION UNDER TITLE VII**
(*Not Against Any Individual Defendant*)

124. Plaintiff repeats and realleges each allegation made in the above paragraphs of this complaint.

125. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

126. Defendant engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions, or privileges of employment because of her opposition to the unlawful employment practices of Defendant.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION UNDER NEW YORK STATE LAW

127. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

128. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

129. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her sex, creating a hostile work environment.

## AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER NEW YORK STATE LAW

130. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

131. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

132. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding and abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER NEW YORK STATE LAW

133. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

134. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

135. Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

15

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action, and for such other relief as the Court deems just and proper.

Dated: August 1, 2022
       Melville, New York

                            SLATER SLATER SCHULMAN LLP

                            *Adam Morelli*
                            Adam Morelli, Esq.
                            John C. Luke, Jr., Esq.
                            445 Broad Hollow Road, Suite 419
                            Melville, New York 11747
                            *Attorneys for Plaintiff*

**DEMAND TO PRESERVE EVIDENCE**

Defendants are hereby directed to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, cause of action and/or prayers for relief, and to any defenses to same, including, but not limited to, electronic data storage, closed circuit TV footage, digital images, computer images, cache memory, searchable data, computer databases, emails, spread sheets, employment files, memos, text messages, any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, MySpace, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.